# UNITED STATES DISTRICT COURT

for the

Middle District of North Carolina

| | |
|---|---|
| In the Matter of the Search of | ) |
| *(Briefly describe the property to be searched or identify the person by name and address)* | ) |
| INFORMATION ASSOCIATED WITH | ) Case No. 1:25MJ222 |
| WALTER@WALTERCOMPTON.COM | ) |
| THAT IS STORED AT PREMISES CONTROLLED BY | ) |
| MICROSOFT | ) |

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

See Attachment "A"

located in the _____Western_____ District of _____Washington_____ , there is now concealed *(identify the person or describe the property to be seized)*:

See Attachment "B"

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

☑ evidence of a crime;

☐ contraband, fruits of crime, or other items illegally possessed;

☐ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. § 1343 | Wire Fraud |
| 18 U.S.C. § 371 | Conspiracy |

The application is based on these facts:

See Attached Affidavit of Special Agent Nathaniel Forthun

☑ Continued on the attached sheet.

☐ Delayed notice of _____ days (give exact ending date if more than 30 days: _____ ) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

On this day, the applicant appeared before me by reliable electronic means, that is by telephone, was placed under oath, and attested to the contents of this Application for a search warrant in accordance with the requirements of Fed. R. Crim. P. 4.1.

/s/ Nathaniel Forthun
*Applicant's signature*

Nathaniel Forthun, Special Agent, HSI
*Printed name and title*

Date: 06/06/25

*Judge's signature*

City and state: Greensboro, North Carolina

United States Magistrate Judge L. Patrick Auld
*Printed name and title*

IN THE UNITED STATES DISTRICT COURT

FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

IN THE MATTER OF THE SEARCH OF
INFORMATION ASSOCIATED WITH
WALTER@WALTERCOMPTON.COM
THAT IS STORED AT PREMISES
CONTROLLED BY MICROSOFT

Case No. 1:25mj222

**AFFIDAVIT IN SUPPORT OF**
**APPLICATION FOR SEARCH WARRANT**

I, Nathaniel Forthun, being first duly sworn, hereby depose and state as follows:

**INTRODUCTION AND AGENT BACKGROUND**

1.     I make this affidavit in support of an application for a search warrant for information associated with the email account walter@waltercompton.com, ("SUBJECT EMAIL ACCOUNT").

2.     The information associated with the SUBJECT EMAIL ACCOUNT is stored at premises controlled by the following company: Microsoft Corporation, an email provider headquartered at One Microsoft Way, Redmond, Washington 98052 ("EMAIL PROVIDER").

3.     The email account to be searched is described in the following paragraphs and in Attachment A. This affidavit is made in support of an application for a search warrant under 18 U.S.C. §§ 2703(a), 2703(b)(1)(A) and 2703(c)(1)(A) to require Microsoft Corporation to disclose to the government copies of the information to be searched and seized (including the content of communications) further described in Section I of Attachment B. Upon receipt of the information described in Section I of Attachment B, government-authorized persons will review that information to locate the items described in Section II of Attachment B.

1

4.      I am a Special Agent with Homeland Security Investigations.  I have been in this position since December 2018. During this time, I have specialized in human smuggling and financial/fraud investigations and have conducted and assisted with investigations involving human smuggling, human trafficking, weapons offenses, sex offenses, narcotic offenses, violent crimes, visa fraud, financial fraud, and immigration violations.

5.      Prior to becoming a special agent with HSI, I was employed by Immigration and Customs Enforcement (ICE) Enforcement and Removal Operations (ERO) as a deportation officer (DO) from July 2016 to December 2018, and by the United States Border Patrol (USBP) as a patrol agent (BPA) from August 2013 to July 2016. As a DO, I interviewed illegal and criminal aliens to identify immigration and criminal violations, arrested illegal aliens, and managed many types of casework relating to immigration proceedings. I also served as an intelligence officer while a DO at ICE ERO, tasked with interviewing illegal aliens to obtain information regarding smuggling organizations and transnational gangs. As a BPA, I was assigned to the Weslaco Border Patrol Station, Rio Grande Valley Sector, as a patrol agent and a collateral intelligence agent. As a patrol agent, I conducted enforcement operations to deter, interdict, and seize individuals and contraband seeking to enter, or which had previously entered the United States in violation of U.S. immigration laws and customs regulations. While assigned as a collateral intelligence agent, I conducted intelligence interviews with criminal and illegal aliens and assisted in the investigation of human and narcotics smugglers, gaining experience and knowledge of the operational techniques of these organizations.

6.      I have attended and completed the Basic Course for Border Patrol Agents, the Criminal Investigator Training Program, and the HSI Special Agent Training Program at the Federal Law Enforcement Training Centers in Artesia, New Mexico and Glynco, Georgia. I have

2

a Bachelor of the Arts in Criminal Justice from Thomas Edison State College. I have received and continue to receive specialized training in constitutional criminal procedure, drug identification and recognition, interview and interrogation techniques, search and seizure, evidence collection, surveillance operations, and standard operating procedures pertaining to various transnational criminal organizations. I received this knowledge from training courses, other law enforcement officers/agents conducting human and narcotics smuggling investigations, as well as from criminal defendants and suspects.

7.     Throughout my career, I have performed various tasks which include, but are not limited to: (a) functioning as a case agent, which entails the management of investigations in several investigative program areas to include human smuggling, human trafficking, narcotics smuggling, violent crimes, financial crimes, and immigration violations; (b) conducting research in both open source and law enforcement sensitive databases and applications on individuals suspected to be involved in criminal activity; (c) performing physical surveillance and thereby observing and recording movements of persons suspected of various criminal activities; (d) interviewing witnesses and cooperating individuals, and (e) testifying before Grand Juries; and (f) swearing to and executing search and arrest warrants.

8.     The facts set forth in this affidavit are based on my personal knowledge, knowledge obtained from other individuals during my participation in this investigation, including other law enforcement officers, interviews of witnesses, review of documents and records related to this investigation, communication with others who have personal knowledge of the events and circumstances described herein, and information gained through my training and experience. The information provided in this affidavit is supported by my training, experience, education, and participation in this and other investigations.

3

9. Because this affidavit is submitted for the limited purpose of establishing probable cause in support of the application for a search warrant, it does not set forth each and every fact that I or others have learned during the course of the investigation. I have set forth only the facts that I believe are necessary to establish probable cause to believe that violations of 18 U.S.C. § 1343 (Wire Fraud) and 18 U.S.C. § 371 (Conspiracy) (the "TARGET OFFENSES") have been committed by Brooke CRAWFORD, Mark DAY, and Dave LEWIS. There is also probable cause to search the information described in Attachment A for evidence of these crimes further described in Attachment B.

## JURISDICTION

10. This Court has jurisdiction to issue the requested warrants because it is "a court of competent jurisdiction" as defined by 18 U.S.C. § 2711, 18 U.S.C. §§ 2703(a), (b)(1)(a), and (c)(1)(a). Specifically, the Court is "a district court of the United States . . . that has jurisdiction over the offenses being investigated." 18 U.S.C. § 2711(3)(a)(i).

## DEFINITION OF TERMS

11. An "email header" is text at the beginning of an email message. It is generated by the client mail program that first sends it and updated by all the mail servers en route to the destination. Each mail server adds more text, including from/to addresses, subject, content type, time stamp and identification data. You can trace the path of the message from source to destination by reviewing the email header text. Many end user email programs hide this information from the user unless they specifically request to view it.

12. An internet cookie file, or "cookie," is a file that a website stores on a user's computer. The website can read the "cookie" and collect information about the computer on which

4

the cookie has been saved. For example, a cookie might be used to track a user's account on the website, a user's preferences, or items in the user's electronic shopping cart.

## THE INVESTIGATION

13.    Carolina's Contracting LLC (CC LLC) is a construction site preparation contractor which operates/operated in North and South Carolina providing services including land development such as clearing and grading, as well as installing wet public utilities such as sewers, storm water, and water systems in residential sub-developments and commercial land projects. CC LLC was formed by Louis Matthews (Matthews) in January 2013, and Jay Sistrunk (Sistrunk) was added as a member in 2014. Together, Sistrunk and Matthews owned CC LLC. In 2019, CC LLC was listed for sale with business broker Walter Compton (Compton) and continued to be intermittently for sale since that time.

14.    In September 2023, Dave LEWIS (LEWIS), representing the Mildred Drake Family Trust (MDFT; for the purposes of this affidavit, MDFT is used as a general term for the individuals and businesses operating jointly/under the umbrella of this organization), approached Compton via email about MDFT's purchase of CC LLC. LEWIS (using email address davelewis74g@gmail.com) and Compton (using email address walter@waltercompton.com) corresponded multiple times regarding MDFT purchasing CC LLC.

15.    During my investigation, I spoke with Compton about his correspondence with MDFT. Compton confirmed that he had been in email communication with three email accounts affiliated with MDFT personnel including LEWIS (using email address davelewis74g@gmail.com), Mark DAY (using email address mark@ablconsultinginc.com), and Brooke CRAWFORD (using email address brooke@crawfordcommunications.org). Compton

5

sent me multiple emails from his correspondence with MDFT and his correspondence with CC LLC regarding MDFT's interest in purchasing CC LLC.

16. One such email was dated September 23, 2023, and received by Compton from LEWIS on behalf of MDFT. On September 25, 2023, Compton responded to LEWIS discussing the partners' willingness to sell CC LLC, provided updated financial details relevant to CC LLC, requested background information on LEWIS, and requested LEWIS complete a Non-Disclosure Agreement (NDA, which was attached to the email).

17. Compton also provided me with an email string showing emails dated September 25 and 27, 2023, from LEWIS wherein LEWIS provided the website https://www.crawfordcommunications.org and stated "...we [MDFT] are huge developers with pending projects in various states as well as abroad were [sic] based out of Houston Texas but have several offices in the US." Compton forwarded this information to Sistrunk and Matthews on September 27, 2023, stating "...Attached is a financial letter showing that Dave Louis's [sic] family trust, Crawford Comm, has the ability to purchase your company for cash, if needed."

18. This email which Compton sent to me noted the attachment "Crawford Comm Financial Capability POF.pdf". This document stated in brief that, pending certain conditions, Lionsgate Funding Group was "...ready willing and able to...open and fund Crawford's account with a $50 Million first tranche...[t]the account can be used for Acquisitions that are less than $20 Million...[and] we will purchase, or through JPM, arrange for the purchase of the Crawford secured notes, initially in $125 Million tranches...". This document was dated April 12, 2023, and was signed by Tony Tunstall, an authorized representative of Lionsgate Funding Group.

19. Compton also provided me an email dated September 27, 2023, according to which he responded to LEWIS and clarified financial details relating to CC LLC.

6

20. Compton provided me with an email from LEWIS dated September 27, 2023, which documented LEWIS' continued interest in CC LLC regardless of changes in CC LLC's financial details.

21. Another email that Compton provided to me documented that a confidentiality agreement was signed (apparently by LEWIS) on September 25, 2023. In a later email in the string dated October 16, 2023, Compton asked LEWIS to call him (Compton).

22. Compton provided me with an email dated October 16, 2023, according to which Compton forwarded to Sistrunk and Matthews LEWIS' claims about the size and scope of Crawford Communications/MDFT (contained in LEWIS' September 25, 2023 email).

23. Compton provided me with another email which documented LEWIS and Compton's attempts to set up a conference call on October 23 or 24, 2023.

24. Compton provided me with an email from LEWIS dated October 28, 2023, wherein LEWIS referenced an attachment about "...my families [sic] bio..." and asked Compton for an executive summary of CC LLC. The attachment was entitled "Drake Family Presentation" and provided an overview of the Mildred Drake Organization, an organizational chart, organizational purpose, organization history, and discussion of its areas of business operation. On October 31, 2023, Compton forwarded this information to Sistrunk and Matthews.

25. Compton also provided me with another email dated October 31, 2023, according to which Compton emailed LEWIS to tell LEWIS that he had provided Sistrunk with LEWIS' "package" (I understood this to mean the documents LEWIS filled out with information about the prospective buyers of CC LLC). Compton told LEWIS he would send LEWIS "a package" as soon as he got permission (I understood this to mean Compton would send LEWIS an executive summary or other CC LLC business data).

7

26.     Compton provided me an email dated November 28, 2023, from Compton to Sistrunk and Matthews in which Compton discussed responding to the "LOI" (I understood this to mean the Letter of Intent by MDFT intending to buy CC LLC). The body of the email appeared to include a copy of a previous email to Brooke (I understood this to mean Brooke CRAWFORD) and David (I understood this to mean David DRAKE) with negotiations in reference to the LOI. A later email in this string from LEWIS dated December 4, 2023, asked Compton what bank "you guys" (I understood this to mean CC LLC) used and if "you" (could be construed to mean either Compton and/or CC LLC) had any "trade references".

27.     Compton provided me with numerous emails as referenced above, but when I spoke with Compton on May 7, 2025, he told me about other emails which he had received from/sent to other MDFT affiliates (as referenced in paragraph 15).

*The "Purchase"*

28.     The discussion between MDFT/LEWIS and CC LLC eventually culminated in the "purchase" of CC LLC by Carolina's Construction Holding Company (CCHC) (an MDFT subsidiary) on March 10, 2024.

29.     The "Master Membership Unit Purchase Agreement" (hereafter purchase agreement) signed on March 10, 2024, required the payment of $50,000 in earnest money via wire transfer to a trust account held by CC LLC's attorney within three days of the signing of the purchase agreement. This money was never received. It further required the payment of $6,950,000 in cash payable upon closing of the transaction (closing to occur within twenty days of the signing of the purchase agreement). None of this money was paid.

8

30.     MDFT also directed a "merger" between CC LLC and one of MDFT's subsidiaries, D&D Maritime USA, Inc. (hereafter D&D) on March 10, 2024. On March 10, 2024, CC LLC and D&D signed a merger agreement which listed CC LLC as the surviving company but "…both [companies would] maintain their respective Company names for the purposes of trading and conducting business." The merger agreement indicated CC LLC would receive $4 billion in real estate from the merger; CC LLC would own fifty-one percent (51%) of the merged company's stock; D&D would own forty-nine percent (49%) of the merged company's stock; D&D would contribute free and clear assets of $5.7 million to the merged company; and D&D would have $2 billion in free and clear assets at the time of the merger.

*The "Buy-In"*

31.     On March 21, 2024, CC LLC issued a resolution documenting the buy-in of MDFT affiliate Kellee SIMS (SIMS) into CC LLC. SIMS was documented as purchasing seventy (70) percent ownership of CC LLC in exchange for contributing real estate assets valued at $1,180,640,000 to CC LLC. The resolution also stated that SIMS' partnership buy-in was to be backdated to December 2022. At approximately the same time, MDFT also installed Brooke CRAWFORD (CRAWFORD, an MDFT affiliate) as a "finance director" at CC LLC and provided CRAWFORD and SIMS CC LLC business email accounts.

*The "Disassociation"*

32.     On May 22, 2024, a letter of termination was sent by Sistrunk and Matthews' attorney to MDFT terminating all association between CC LLC and MDFT due to failure of MDFT to make the contractually required payments in the purchase agreement. Legal disputes regarding the ownership of CC LLC continued over the following month(s), with filing(s) in the Superior

9

Court of Cabarrus County, and an attempt by MDFT to remove the case from the Superior Court of Cabarrus County to the United States District Court, Middle District of North Carolina. MDFT has engaged with CC LLC as recently as June 3, 2025, when Raysean GRAHAM filed a motion for relief against CC LLC in United States Bankruptcy Court.

*Communications Involving SUBJECT EMAIL ACCOUNT*

33.     As stated above, during the time period that Compton and LEWIS were corresponding, Compton forwarded a document entitled "Crawford Comm Financial Capability POF" to Sistrunk and Matthews which described MDFT's (specifically MDFT-affiliated Crawford Communications[1]) financial capacity to purchase CC LLC. The document stated in brief that, pending certain conditions, Lionsgate Funding Group was "…ready willing and able to…open and fund Crawford's account with a $50 Million first tranche…[t]the account can be used for Acquisitions that are less than $20 Million…[and] we will purchase, or through JPM, arrange for the purchase of the Crawford secured notes, initially in $125 Million tranches…". This document was dated April 12, 2023, and was signed by Tony Tunstall, an authorized representative of Lionsgate Funding Group[2].

34.     I know this document is fraudulent because Lionsgate Funding Group, Inc. was administratively dissolved by the State of Georgia on October 28, 2022, "…for failure to file its annual registration, failure to maintain a registered agent or registered office in this state, and/or failure to submit payment for a dishonored fee payment or for fees, taxes, or penalties owed." The

---

[1] Compton referred to Crawford Communications as Dave LEWIS' family trust, conflating Crawford Communications with the MDFT (specific entity) and LEWIS identified Crawford Communication as a subsidiary of MDFT.
[2] I later learned that a "Tony Tunstall" was the Chief Financial Officer of ABL Consulting, Inc., the business operated by Mark DAY, a fellow MDFT affiliate.

10

"Crawford Comm Financial Capability POF" specifically stated Lionsgate Funding Group (Inc.) was a Georgia corporation.

35.    Thus, MDFT's offer of proof for its financial capability to purchase CC LLC was predicated on funding by a business (Lionsgate Funding Group, Inc.) which had been dissolved on October 28, 2022—approximately six months prior to the date of the document offering funding, and approximately eleven months before this document was presented to CC LLC as proof of MDFT's ability to purchase CC LLC.

36.    HSI and Compton jointly attempted to digitally retrieve all known communications between Compton and MDFT, but due to technological difficulties were unable to verify the retrieval of all the emails. Based on my conversation with Compton in which he told me he regularly cleaned out his deleted emails folder, I have reason to believe that Compton may have deleted one or more emails between himself and MDFT associates. Specifically, Compton could not locate the email wherein he received the "Crawford Comm Financial Capability POF" attachment. I also believe that Compton's email provider may be able to provide metadata/header data/IP data which could direct investigators to the sender of the potentially deleted email(s). This type of data is roughly analogous to the address/postal data from the outside of a paper envelope or to some data derived from phone tolls.

37.    As detailed above, I know Compton's email account was in contact with at least three MDFT affiliates (I believe this to be during the time Compton was actively involved in the purchase negotiations, thus, approximately late 2023 to possibly early 2024). I know Compton's email account contains the "Crawford Comm Financial Capability POF" document which was fraudulent and was provided to CC LLC in support of MDFT's ability to purchase CC LLC. I believe that a more complete review of emails/header data between MDFT affiliates and Compton

11

may result in the discovery of who sent Compton the above document, and may uncover additional evidence of wire fraud. Therefore, I submit there is probable cause that email account walter@waltercompton.com contains evidence of the TARGET OFFENSES.

## BACKGROUND REGARDING EMAIL PROVIDER'S SERVICES

38.     In my training and experience, I have learned that the EMAIL PROVIDER provides the public with a variety of on-line services, including electronic mail (email) access. The EMAIL PROVIDER allows subscribers to obtain email accounts under various domain names. Subscribers obtain an account by registering with the EMAIL PROVIDER or with an intermediary. During the registration process, the EMAIL PROVIDER or its intermediary asks subscribers to provide basic personal information, which may include name, address, phone numbers, payment information, and other personal information. Therefore, the computers of the EMAIL PROVIDER are likely to contain stored electronic communications (including retrieved and unretrieved email for the EMAIL PROVIDER's subscribers) and information concerning subscribers and their use of the EMAIL PROVIDER's services, such as account access information, email transaction information, and account application information. In my training and experience, such information may constitute evidence of the crimes under investigation because the information can be used to identify the account's user or users. Based on my training and experience, I know that, even if subscribers insert false information to conceal their identity, this information often provides clues to their identity, location, or illicit activities.

39.     In my training and experience, email providers typically retain certain transactional information about the creation and use of each account on their systems. This information can include the date on which the account was created, the length of service, records of log-in (i.e., session) times and durations, the types of service utilized, the status of the account (including

12

whether the account is inactive or closed), the methods used to connect to the account (such as logging into the account via the provider's website), and other log files that reflect usage of the account. In addition, email providers often have records of the Internet Protocol address ("IP address") used to register the account and the IP addresses associated with particular logins to the account. Because every device that connects to the Internet must use an IP address, IP address information can help to identify which computers or other devices were used to access the email account.

40.     In general, an email that is sent to an EMAIL PROVIDER's subscriber is stored in the subscriber's "mailbox" on the EMAIL PROVIDER's servers until the subscriber deletes the email. If the subscriber does not delete the message, the message can remain on the EMAIL PROVIDER's servers indefinitely. Even if the subscriber deletes the email, it may continue to be available on the EMAIL PROVIDER's servers for a certain period of time.

41.     A sent or received email typically includes the content of the message, source and destination addresses, the date and time at which the email was sent, and the size and length of the email. If an email user writes a draft message but does not send it, that message may also be saved by the EMAIL PROVIDER but may not include all of these categories of data.

42.     This application seeks a warrant to search all responsive records and information under the control of the EMAIL PROVIDER, which is subject to the jurisdiction of this Court, regardless of where the EMAIL PROVIDER has chosen to store such information.

43.     As explained herein, information stored in connection with an email account may provide crucial evidence of the "who, what, why, when, where, and how" of the criminal conduct under investigation, thus enabling the United States to establish and prove each element or, alternatively, to exclude the innocent from further suspicion.

13

44.     In my training and experience, the information stored in connection with an email account can indicate who has used or controlled the account. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence. For example, email communications, contact lists, and images sent (and the data associated with the foregoing, such as date and time) may indicate who used or controlled the account at a relevant time.

45.     Further, information maintained by the email provider can show how and when the account was accessed or used. For example, as described below, email providers typically log the Internet Protocol (IP) addresses from which users access the email account, along with the time and date of that access. By determining the physical location associated with the logged IP addresses, investigators can understand the chronological and geographic context of the email account access and use relating to the crime under investigation. This geographic and timeline information may tend to either inculpate or exculpate the account owner.

46.     Additionally, information stored at the user's account may further indicate the geographic location of the account user at a particular time (*e.g.*, location information integrated into an image or video sent via email). Last, stored electronic data may provide relevant insight into the email account owner's state of mind as it relates to the offense under investigation. For example, information in the email account may indicate the owner's motive and intent to commit a crime (*e.g.*, communications relating to the crime), or consciousness of guilt (*e.g.*, deleting communications in an effort to conceal them from law enforcement).

47.     Based on my training and experience, I know that some email providers, including Microsoft Corporation, often use internet cookie files to track user information. These "cookies" may allow the email providers to collect information about the account users' computers, including

14

information about other accounts accessed by a computer containing the email provider's "cookie." Specifically, the EMAIL PROVIDER may collect information about other email accounts with their service that were accessed by the computers that also accessed the email account described in Attachment A. Information regarding other email accounts accessed from the same computer(s) that accessed the email account described in Attachment A may provide important evidence about the person using both accounts, including his/her identity and location, as well as the full extent of the fraud.

## INFORMATION TO BE SEARCHED AND THINGS TO BE SEIZED

48.     Pursuant to Title 18, United States Code, Section 2703(g), this application and affidavit for a search warrant seeks authorization to permit the EMAIL PROVIDER and its agents and employees to assist agents in the execution of this warrant. Once issued, the search warrant will be presented to the EMAIL PROVIDER with direction that it identify the relevant account(s) described in Attachment A to this affidavit, as well as other subscriber and log records associated with the account, as set forth in Section I of Attachment B of this affidavit and provide a copy of the specified account and records.

49.     I, and/or other law enforcement personnel, will thereafter review the copy of the electronically stored data and identify from among that content those items that come within the items identified in Section II to Attachment B, for seizure.

50.     Analyzing the data contained in the forensic image may require special technical skills, equipment, and software. It could also be very time-consuming. Searching by keywords, for example, can yield thousands of "hits," each of which must then be reviewed in context by the examiner to determine whether the data is within the scope of the warrant. Merely finding a relevant "hit" does not end the review process. Keywords used originally need to be modified

15

continuously, based on interim results. Certain file formats, moreover, do not lend themselves to keyword searches, as keywords, search text, and many common email, database and spreadsheet applications do not store data as searchable text. The data may be saved, instead, in proprietary non-text format. And, as the volume of storage allotted by service providers increases, the time it takes to properly analyze recovered data increases, as well. Consistent with the foregoing, searching the recovered data for the information subject to seizure pursuant to this warrant may require a range of data analysis techniques and may take weeks or even months. All forensic analysis of the data will employ only those search protocols and methodologies reasonably designed to identify and seize the items identified in Section II of Attachment B to the warrant.

**CONCLUSION**

51.    Based on the forgoing, there is probable cause to believe the SUBJECT EMAIL ACCOUNT contains evidence of the TARGET OFFENSES. I request that the Court issue the proposed search warrant. This Court has jurisdiction to issue the requested warrant because it is "a court of competent jurisdiction" as defined by 18 U.S.C. § 2711. 18 U.S.C. §§ 2703(a), (b)(1)(A) & (c)(1)(A). Specifically, the Court is a district court of the United States that has jurisdiction over the offense being investigated.

52.    Pursuant to 18 U.S.C. § 2703(g), the presence of a law enforcement officer is not required for the service or execution of this warrant. Because the warrant will be served on the EMAIL PROVIDER, who will then compile the requested records at a time convenient to it, reasonable cause exists to permit the execution of the requested warrant at any time in the day or night. Accordingly, by this Affidavit and Warrant, I seek authority for the government to search all of the items specified in Section I, Attachment B (attached hereto and incorporated by reference

16

herein) to the Warrant, and specifically to seize all of the data, documents, and records that are

identified in Section II to that same Attachment.


/s/ Nathaniel Forthun
Special Agent Nathaniel Forthun
Homeland Security Investigations


On this day, the applicant appeared before me by reliable electronic means, that is by telephone, was placed under oath, and attested to the contents of this Application for a search warrant in accordance with the requirements of Fed. R. Crim. P. 4.1.

06/06/20

The Hon. L. Patrick Auld
United States Magistrate Judge
Middle District of North Carolina

17

## Attachment A

### Property to Be Searched

This warrant applies to information associated with the email account walter@waltercompton.com (SUBJECT EMAIL ACCOUNT) that is stored at premises controlled by Microsoft Corporation, a company that accepts service of legal process digitally and is headquartered at One Microsoft Way, Redmond, Washington 98052.

18

**Attachment B**

**Particular Things to be Seized**

I.  **Information to be disclosed by Microsoft Corporation (the "Provider")**

To the extent that the information described in Attachment A is within the possession, custody, or control of the Provider, regardless of whether such information is stored, held or maintained inside or outside of the United States, including any emails, records, files, logs, or information that has been deleted but is still available to the Provider, the Provider is required to disclose the following information to the government for walter@waltercompton.com (SUBJECT EMAIL ACCOUNT) as listed in Attachment A from **September 23, 2023 to June 30, 2024**:

a.  General Account Identification Data: All records or other information regarding the identification of the SUBJECT EMAIL ACCOUNT, to include full name, physical address, telephone numbers and other identifiers, records of session times and durations, the date on which the account was created, the length of service, the IP address used to register the account, login IP addresses associated with all session times and dates, account status, alternative email addresses provided during registration, methods of connecting, log/activity files, and means and source of payment (including any credit or bank account number);

b.  Content Data/Communications/Deleted Data between SUBJECT EMAIL ACCOUNT and the following email accounts (SPECIFIC EMAIL ACCOUNTS):

davelewis74g@gmail.com

mark@ablconsultinginc.com

brooke@crawfordcommunications.org

kahleestar@gmail.com

myasha@mildreddrakefamilytrust.com

19

david@mildreddrakefamilytrust.com

raysean_graham@yahoo.com

myashagraham88@gmail.com

kellee@mildreddrakefamilytrust.com

dave@mildreddrakefamilytrust.com

myashagraham@gmail.com

brooke.a.crawford@gmail.com

raysean@mildreddrakefamilytrust.com

      c.      The information ordered in section "b" is further described in this and the following sections and shall include: All records, files, and other information (including data and the content of electronic communications or contained in "draft" or "trash" folders) for Microsoft emails services associated with the SUBJECT EMAIL ACCOUNT;

      d.      The contents of all communications between SUBJECT EMAIL ACCOUNT and SPECIFIC EMAIL ACCOUNTS including emails, attachments, metadata/header data/IP data, and chat messages associated with the SUBJECT EMAIL ACCOUNT, including stored or preserved copies of chat/email logs, emails sent to SUBJECT EMAIL ACCOUNT from SPECIFIC EMAIL ACCOUNTS, emails sent from SUBJECT EMAIL ACCOUNT to SPECIFIC EMAIL ACCOUNTS, draft communications between SUBJECT EMAIL ACCOUNT and SPECIFIC EMAIL ACCOUNTS, the source and destination addresses associated with each communication, the date and time at which each communication was sent, and the size/length/character count of each communication; and header information including the actual IP addresses of the sender and recipients of the emails, and all forwarding or fetching accounts relating to walter@waltercompton.com;

e.    **All data retained by the Provider regarding deleted emails/data** between SUBJECT EMAIL ACCOUNT and SPECIFIC EMAIL ACCOUNTS including but not limited to: The source and destination addresses associated with each communication, the date and time at which each communication was sent, the size/length/character count of each email, and the timestamp of each email; and header information including the actual IP addresses of the sender and recipients of the emails, and any information regarding attachments.

## II.    Information to be seized by the government

All information described above in Section I that constitutes fruits, contraband, evidence and instrumentalities of violations of 18 U.S.C. § 1343 (Wire Fraud), and/or 18 U.S.C. § 371 (Conspiracy), and aiding and abetting of these offenses, for each account or identifier listed on Attachment A, in the form of the following:

(a) Evidence of the identification or location of the user(s)/creator(s) of the SUBJECT EMAIL ACCOUNT;

(b) Evidence of individuals collaborating, conspiring, or assisting (knowingly or unknowingly) in the commission of financial fraud in the purchase of CC LLC; or (ii) communicating with the SUBJECT EMAIL ACCOUNT about the fraudulent purchase of CC LLC;

(c) Communications, attachments, documents, header information, and deleted content about: an intent to defraud CC LLC; the "purchase" of CC LLC; the transfer of assets from MDFT (umbrella organization) to CC LLC or vice versa; financing/credit applications/documents used to "purchase" CC LLC or show ability to purchase CC LLC; wire transfers; fraudulent financial statements from MDFT; communications showing MDFT was attempting to "purchase" other

21

businesses beside CC LCC; and communications indicating defrauding CC LLC was part of an ongoing pattern of fraudulent behavior;

(d) Evidence showing the identity of the service provider of the SPECIFIC EMAIL ACCOUNTS and any other identifying or usage information/data for the SPECIFIC EMAIL ACCOUNTS.